UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KELLY LAVINO,                          )      CV 08-2910 SVW (FMCx)
                                       )
                    Plaintiff,         )
                                       )      FINDINGS OF FACT AND
              v.                       )      CONCLUSIONS OF LAW
                                       )
METROPOLITAN LIFE INSURANCE            )
COMPANY; MALCOLM PIRNIE LONG TERM      )
DISABILITY PLAN,                       )
                                       )
                    Defendants.        )
_____)

**I.    Introduction**

      Plaintiff Kelly Lavino ("Plaintiff") brought this action against

Defendant Metropolitan Life Insurance Company ("Defendant" or

"MetLife") and Malcolm Pirnie Long Term Disability Plan, to recover

benefits under the terms of an ERISA plan administered by Defendant.

Plaintiff seeks to recover disability benefits from January 7, 2008,

when her claim was terminated, to date.  Having conducted a bench trial on January 21, 2009 the Court now makes the following findings of facts and conclusion of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons that follow, the Court finds that Defendant abused its discretion by deciding to terminate Plaintiff's long-term benefits under the Plan.

**II.  Facts**

Plaintiff worked as a project engineer for Malcom Pirnie, Inc. ("Malcom Pirnie").  As an employee of Malcom Pirnie, Plaintiff was covered under a long-term disability plan (the "Plan") issued by MetLife.  (AR 510.)  As a Plan participant, Plaintiff is entitled to receive long-term disability benefits if she becomes, and remains "disabled" while covered by the plan.  The Plan defines "Disabled" as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.   during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2.   after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(AR 563.)  The Plan defines "Own Occupation" as:

the activity that you regularly perform and that serves as your

source of income.  It is not limited to the specific position you

held with your Employer.  It may be a similar activity that could

be performed with your Employer or any other Employer.

(AR 564.)  Further, the Plan prescribes that long-term benefits can

terminate if the participant is no longer "disabled," or fails to

provide evidence of continuing disability.  (AR 38, 22.)  Finally, the

Plan contains language explicitly delegating discretionary powers to

MetLife.[1]

In 2003 Plaintiff was diagnosed with breast cancer.  Following a

mastectomy, she returned to work in 2004 as she underwent chemotherapy.

On January 3, 2006, Plaintiff took a leave of absence from work.  (Id.

at 346.)  Thereafter, in October 2006, she applied for short and long-

term disability coverage.  (Id. at 345-49.)  Plaintiff's claim was

supported by her physician Dr. Michael Flaningam.  (Id. at 347.)  Dr.

Flaningam stated in his Attending Physician Statement that he diagnosed

Plaintiff as having fibromyalgia, with a secondary diagnosis of

fatigue.  (Id.)  According to the American College of Rheumatology, the

criteria for classification of fibromyalgia is (1) a history of

widespread pain, and (2) pain in 11 of 18 tender point sites.  (Collins

Decl., Ex. 3 at 22.)  Dr. Flaningam asserted that Plaintiff "has total

body pain, typically in the muscles, but sometimes in the joints.  She

---

[1] The relevant portion of the Plan states:
> In carrying out their respective responsibilities under the
> Plan, the Plan Administrator and other Plan fiduciaries shall
> have discretionary authority to interpret the terms of the Plan
> and to determine eligibility for an entitlement to Plan benefits
> in accordance with the terms of the Plan.  Any interpretation or
> determination made pursuant to such discretionary authority
> shall be given full force and effect, unless it can be shown
> that the interpretation or determination was arbitrary and
> capricious.  (AR 494.)

is tired all the time and has difficulty concentrating." (AR 347) Dr. Flaningam also noted that he expected Plaintiff could return to work on January 2, 2007. (Id.) In early January, however, Dr. Flaningam faxed MetLife a note indicating that he was extending her disability through June 30, 2007. (AR 341.) Dr. Flaningam noted: "I'm skeptical she'll ever be able to work on a daily basis or more than several hours straight." (Id.)

In evaluating Plaintiff's claim, MetLife requested Plaintiff's employer fill out a job description form. On the form, Plaintiff's employer indicated Plaintiff's job required: 3-4 hours of sitting and standing, 1-2 hours of walking, 7-8+ hours of foot control for both feet, 7-8+ hours of repetitive use of both hands, 1-2 hours of grasping with both hands, 3-4 hours of fine finger dexterity in the right hand, 3-4 hours of use of neck in a static position, 1-33% of the time lifting up to 10 pounds, 34-66% frequency of interpersonal relationships to perform the job, and 1-33% frequency of stressful situations necessary to perform the job. (AR 339.) The employer also indicated that in the course of performing the job Plaintiff was not required to: drive cars, trucks, forklifts and/or other equipment; be around moving equipment and/or machinery; walk on uneven ground; be exposed to dust, gas, or fumes; be exposed to marked changes in temperature or humidity; or be required to do overtime on a routine basis. (Id.)

Plaintiff's employer, however, complained through its insurance broker that it was "unsatisfied with the job description form" and stated that the form was "very unprofessional." (AR 321.) In response, MetLife interviewed Plaintiff directly. (Id.) Plaintiff

reported that her job consisted of "preparing reports, overseeing projects, marketing, office work, driving to see clients, and monitoring construction sites." (Id.)  In light of the new information, MetLife categorized Plaintiff's job as "Medium." (Id.) On January 17, 2007, Plaintiff's short-term claim for disability benefits was approved for benefits from January 4, 2006 to March 28, 2006. (AR 337.)  In MetLife's records, the entry for January 17, 2007 indicates MetLife had classified Plaintiff's job as "sedentary," and describes her job as indicated in the form filled out by Plaintiff's employer, not as indicated by Plaintiff in her interview. (AR 324.) Nevertheless, the claim note states Plaintiff "is not able to safely perform the essential duties of her job." (AR 324-35.)

On January 31, 2007, MetLife denied Plaintiff's long-term benefit claim on the ground that her claim was filed late. (AR 311-12.) MetLife then reconsidered its denial when Plaintiff's employer took responsibility for the late submission. (AR 81.)  MetLife therein agreed to complete a full review of Plaintiff's claim.

On February 16, 2007, MetLife requested additional medical information from Dr. Flaningam. (AR 306.)  In his response Dr. Flaningam described Plaintiff's symptoms as "total body pain in muscles and joints.  She is tired all the time and has difficulty concentrating." (AR 307.)  Dr. Flaningam reported that Plaintiff is unable to engage in stress situations or in interpersonal relations. (AR 308.)  He also reported that Plaintiff could sit for 3 hours intermittently and walk for 2 hours intermittently, but could not stand for an hour. (Id.)  Dr. Flaningam concluded that Plaintiff could not work due her fatigue and limited ability to concentrate. (AR 307-310.)

In support of his findings, Dr. Flaningam provided MetLife with Plaintiff's complete record of treatment from January 2006 forward. (AR 280-304.)

Included in Plaintiff's record was a report completed by Dr. Carolyn Dennehey, a rheumatologist who examined Plaintiff in May 2006. (AR 302-305.)  Dr. Dennehey's report confirmed Plaintiff's diagnosis as fibromyalgia, and also noted Plaintiff had positive FABER and positive straight leg raise.  (AR 303.)

On March 12, 2007, MetLife approved Plaintiff's claim for long-term disability benefits.  (AR 276.)[2]  MetLife also encouraged Plaintiff to apply for Social Security benefits, and referred Plaintiff to an attorney who specializes in the Social Security process.  (AR 266-267.)

On April 11, 2007, Dr. Flaningam faxed MetLife his notes from Plaintiff's April 11, 2007 appointment.  (AR 260-61.)  The note indicated that Plaintiff had not had "much luck [with] medications in the past," but that Plaintiff did take Ambien as a sleep medication. (Id.)  Further, the note indicated that Plaintiff was going take Lyrica, a new medicine for fibromyalgia.  (Id.)

On May 14, 2007, Dr. Flaningam faxed MetLife his notes from Plaintiff's May 11, 2007 appointment.  (AR 247-48.)  Dr. Flaningam noted that Plaintiff's total pain increased the month she was on Lyrica.  (AR 248.)  As such, Dr. Flaningam states: "Lyrica didn't work out; I'm not sure that any medicine will bring about significant relief, and she would rather not try anything else now."  (Id.)  Dr. Flaningam also noted that "Neither of us think she'll be able to work

---

[2] The letter approving Plaintiff's LTD claim indicated that her LTD benefit should be calculated by taking 70% of her basic salary.  In April 2007, Plaintiff's employer instructed MetLife to reduce Lavino's benefit to 60%.  (AR 96-97.)

in any capacity July 1, as our previous goal, this likely will be at least several months beyond this; we'll therefore set a goal of January 1, 2008." (Id.)

In August 2007, Plaintiff filled out a "Personal Profile" form at the request of MetLife. (AR 232.) Plaintiff described trouble sleeping (AR 224), constant joint and muscle pain, as well as limited ability to concentrate and problem solve (AR 223.) Plaintiff reported that she expected to return to work "as soon as I can sit in a chair or stand for longer than 1/2 hour w/o pain, as soon as I can carry on a conversation w/o forgetting what we were talking about." (AR 225.)

In October 2007, Plaintiff advised MetLife that she had been denied Social Security disability. (AR 106.) MetLife advised Plaintiff to appeal the denial, and again referred Plaintiff to an attorney.[3] (AR 106.)

On November 9, 2007, Dr. Flaningam faxed MetLife his progress notes from Plaintiff's October 24, 2007 appointment. (AR 216-217.) Dr. Flaningam noted that Plaintiff wanted to avoid "meds." (AR 217.) He also noted that Plaintiff "[f]eels like she is getting worse and thinks she is as bad as she has ever been. Is in pain all the time, all over." (Id.) Dr. Flaningam reiterated his opinion that Plaintiff was unable to work. (Id.)

In November 2007, MetLife's records reflect that MetLife continued to document Plaintiff's job duties as "sedentary" citing the information put forth in the employer's form, but not citing any information from Plaintiff's interviews. (AR 113.)

---

[3] Plaintiff claims that MetLife "retained" the attorney, but there is no indication that MetLife paid for the attorney.

In November, MetLife referred Plaintiff's file for review to the Network Medical Review ("NMR").[4]  NMR retained Dennis Payne, M.D., a board certified rheumatologist, to review Plaintiff's file.  Dr. Payne reviewed Plaintiff's file, as well as spoke to Dr. Flaningam.  Dr. Payne's notes from his telephone call with Dr. Flaningam state that Dr. Flaningam "reported no evidence of any destructive features of any inflammatory rheumatic disease.  He did not find any evidence of any other disease process producing restrictions and limitations on activities."  (AR 205.)  After a short summary of Plaintiff's file, Dr. Payne concluded that "[f]rom a rheumatology viewpoint, there is no evidence in the medical record data submitted that there are any restrictions or limitations on activities. . . .  Currently in opinion [sic] of this reviewer, there is no objective finding that would lead to restrictions or limitations on activities."  (AR 207.)  Dr. Payne found, after reviewing Plaintiff's record, that Plaintiff maintained no functional limitations, and she could safely perform the functions of her job.  (AR 206-7.)

On December 4, 2007, MetLife again interviewed Plaintiff regarding her job description.  Plaintiff reported that her job involved marketing, speaking with clients, preparing and presenting proposals.  Plaintiff further noted that when she is awarded a project, she is involved in staffing, assignments, budgeting, and overseeing construction.  (AR 114-15.)  Plaintiff also reported that her job included travel, possibly interstate.  (AR 115.)  In response, MetLife changed Plaintiff's job classification to "light."  (Id.)

///

---

[4] NMR is a medical review firm routinely used by MetLife.

Thereafter, Dr. Flaningam was asked to respond to "MetLife's Position that there is no medical data to support Mrs. Lavino in [sic] incapable of working in a light class position." (AR 203.)  In his letter, Dr. Flaningam responds saying:

> Dr. Payne agreed with me that patients with similar symptoms as Mrs. Lavino's (mainly the chronic diffuse pain and generalized fatigue) are a challenge because there typically [sic] no objective findings.  The crucial point, however, is that this doesn't mean there is no pathology; currently, in our evidence based on data driven health care system, we have no good way of measuring pain and fatigue in a patient with fibromyalgia or other chronic pain syndromes.  I believe most experts in these conditions would agree that a major pathophysiologic problem lies in the central (brain) processing of sensory data; there is no good way to measure this.  Therefore, when MetLife expects "clinical findings" supporting disability in someone like Mrs. Lavino, I would hope they would understand the difficulty in providing this.

(Id.)  Dr. Flanigam also requested "MetLife's help in letting me know more specifically what information would assist in showing disability in Mrs. Lavino's case. . . .  If seeing a psychiatrist or doing neuropsychiatric testing would help you, then let me know.  I'm not planning on either now, as I don't think it would be of much clinical benefit to her." (Id.)

Regarding Dr. Flanigam's request for what information would assist in demonstrating Plaintiff's disability, a MetLife representative stated that any response to the request "could be interpreted as

9

directing care." (AR 117.)  Accordingly, MetLife never specifically
responded to Dr. Flanigam's request, but instead referred the letter to
NMR. (AR 117.)  Dr. Payne responded to Dr. Flanigam's concerns with
the following:

> I have carefully reviewed a letter prepared by Dr. Flaningam on
> 12/10/07 in which he brings out excellent points in regards to the
> chronic pain syndrome that is being discussed in this situation.
> Although it is true that majority of clinicians and researchers
> feel that the pain produced in fibromyalgia is probably a real
> pain and based upon a pain processing abnormality that is not
> clearly understood scientifically, we also must state that
> throughout all medical literature, there is no evidence that this
> condition produces any physiologically meaningful abnormality
> despite the symptoms.  Advice from a clinician to avoid activity
> is a limitation that clearly has not been shown to produce any
> meaningful symptom change or functional improvement.  Therefore,
> fibromyalgia syndrome is not a limiting condition.  To state that
> Ms. Lavino can perform work at a light level would mean that
> fibromyalgia syndrome is in fact producing some degree of
> limitations and restrictions in her case.  Since this reviewer is
> unable to find objective reasoning for such restrictions and
> limitations, she has no restrictions or limitations on activity.
>
> In summary, there are no restrictions or limitations on activity.

(AR 201-2.)  Dr. Payne does not give suggestions for further testing
that would substantiate Plaintiff's disability.

MetLife terminated Plaintiff's benefits on January 7, 2008. (AR
195.)  Plaintiff, however, claimed not to have received the termination

letter (AR 195), and asked Dr. Flaningam to fax MetLife his notes from Plaintiff's January 23, 2008 appointment in which he reiterated that Plaintiff was in pain, and that she would not be able to return to work soon.  (AR 198.)  MetLife re-sent Plaintiff's denial letter in which it explained that Dr. Payne had "was unable to find objective reasoning for restrictions and limitations and that [Plaintiff] had no restrictions or limitations on activity." (AR 189.)  The letter went on to state that "the medical information contained in [Plaintiff's] file does not support a severity of a condition that would prevent [Plaintiff] from performing the essential duties of [her] job."  (Id.) The letter also stated that if she desired to appeal, she should do so in writing and submit therewith:

> physical exam findings that would indicate a severity of
> impairment, current diagnostic test results with positive findings
> and would indicate a severity of impairment, current restrictions
> and limitations that would preclude you from performing your job
> duties as a Project Engineer and documentation of your current
> diagnosis and treatment plan with a full time return to work date.

(Id.)

Plaintiff's appeal documents included documents from Dr. Flaningam outlining Plaintiff's symptoms, physical limitations and course of treatment, as well as a second report from Dr. Dennehey.  (AR 192-193, 185-187, 181-183.)  Dr. Flaningam reiterated that Plaintiff met all diagnostic criteria for a diagnosis of fibromyalgia.  (AR 187.)  Dr. Dennehey reconfirmed Plaintiff's diagnosis and recommended Plaintiff start on Feldene, as well as tender point injections.  (AR 183.)

///

Upon receiving Plaintiff's appeal documents, MetLife requested another review from NMR. (AR 127.) This time, NMR retained Tanya Lumpkins, M.D., also a board certified rheumatologist, to conduct the review. (AR 167-173.)

After summarizing Plaintiff's treatment and symptoms, including that Plaintiff reports not to be able to sit for longer than 15 minutes without getting intolerable back pain, Dr. Lumpkins found: "The medical record does not demonstrate a rheumatologic diagnosis of sufficient severity to impair the claimant's physical function that would limit her from performing the routine duties of a sedentary position from 01/07/08." (AR 0171.) Dr. Lumpkins noted, however, that Dr. Dennehey did document that Plaintiff had a positive FABER and positive straight leg raise, but concluded that "there is insufficient data to support that the claimant has a functional limitation to require restrictions beyond those associated with a sedentary occupation." (AR 172.)

Further, in response to whether Plaintiff's prescribed medications would impact her ability to safely perform her job, Dr. Lumpkins stated, "The claimant had been prescribed Vicodin as a measure for managing the pain, and any chronic use of narcotics would be associated with the recommendation that she not work at unrestricted heights, drive a company vehicle, work with heavy machinery, or safety-sensitive material as a potential safety risk for herself or others." (AR 172.) Dr. Lumpkins also stated, "[w]ith regards to the psychological impairment, it would require a reviewer with expertise in the field of psychology or psychiatry to determine the severity of the claimant's impairment, and it was recommended that a possible neuropsychological evaluation would be beneficial in this matter." (AR 171.)

On February 12, 2008, Dr. Flaningam faxed MetLife notes from his appointment with Plaintiff on February 8, 2008, as well as a Fibromyalgia Residual Functional Capacity Questionnaire ("functional capacity questionnaire"). (AR 159-165.) Both the notes and the functional capacity questionnaire reiterated Plaintiff's fatigue, confusion, inability to concentrate and overall pain. (AR 159-167.) The functional capacity questionnaire specifically reports that Plaintiff cannot sit continuously for longer than 15 minutes and cannot stand continuously for longer than 10 minutes. (AR 163.) Further, the functional capacity questionnaire states that Plaintiff can sit less than 2 hours in an 8 hour work day with normal breaks, and further would have to take unscheduled breaks of 20 minutes on average every hour. (AR 163, 164.)

On February 13, 2008, Dr. Lumpkins provided a supplemental opinion which stated that she had been forwarded additional records that include progress notes from Dr. Dennehey. (AR 156.) Dr. Lumpkins concluded that "the additional medical records do not change the original review expressed in the initial review performed on 2/11/08. The reason that it does not change my initial opinion is that the diagnosis of fibromyalgia was never questioned based on prior medical records. The documentation of the diagnosis was sufficient for this rheumatologist; however, the physical examination as documented by Dr. Dennehy does not significantly demonstrate impairment of the musculoskeletal system that would support severity in the claimant's physical functions sufficient to limit her ability to perform sedentary work for the dates in question." (AR 157.)

///

On February 18, 2008, MetLife sent Plaintiff a fax informing her that MetLife had faxed a consultant's review to Dr. Flaningam so he could review and comment on the report. (AR 154.) Plaintiff was warned that if Dr. Flaningam did not respond to MetLife by February 25, 2008, MetLife would make its determination on the current record. (Id.)

On February 20, 2008, Plaintiff wrote to MetLife objecting that "there is no requirement in the policy language that requires an objective finding for [her] disability." (AR 152.) Plaintiff further argued that, nevertheless, the functional capacity questionnaire and her doctor's diagnosis should suffice as objective findings. (AR 152.) On February 23, 2008, Plaintiff again wrote to MetLife objecting to the objective evidence requirement, and asking what specifically MetLife was looking for. (AR 150.)

On February 27, 2008, MetLife upheld the denial of Plaintiff's benefits. (AR 141-143.) The letter specifically noted that "the medical records failed to demonstrate a rheumatologic diagnosis of sufficient severity to preclude you from performing the routine duties of a sedentary capacity." (AR 142.)

On March 18, 2008, Dr. Flaningam's office faxed a letter from Dr. Flaningam to MetLife responding to MetLife's February 18, 2008 letter, as well as his notes from Plaintiff's March 13, 2008 appointment. (AR 135-37.) Dr. Flaningam reiterated Plaintiff's pain, and mental and physical fatigue. (Id.)

On March 21, 2008, MetLife acknowledged receipt of the additional information, but notified Plaintiff that it did not change MetLife's ///

14

denial of benefits.  (AR 134.)  Plaintiff submitted no further appeals to MetLife.

As the matter now stands before the Court, there is no dispute between the parties that Plaintiff has fibromyalgia.  The dispute concerns only whether Plaintiff submitted evidence that supports her disability claim, i.e. evidence that fibromyalgia limited her functionality to the point that she could not perform her own occupation.

**III. Analysis**

**A.   Standard of Review**

As an initial matter, the Court must determine the standard of review to apply to MetLife's decision to terminate Plaintiff's benefits.  The default standard of review applicable to a plan administrator's decision to deny benefits is de novo.  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).  If the plan unambiguously gives the plan administrator discretion to determine a plan participant's eligibility for benefits, however, then the standard of review shifts to abuse of discretion.  Id.  Here, the plan grants discretionary authority.  (See supra n. 1.)  Accordingly, the Court will review MetLife's decision for an abuse of discretion.  Notably, however, "[t]he manner in which a reviewing court applies the abuse of discretion standard . . . depends on whether the administrator has a conflict of interest."  Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 629 (9th Cir. 2009).

"In the absence of a conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse of discretion standard."  Id. at 630.  Where,

however, the same entity that funds an ERISA benefits plan also evaluates the claims, the plan administrator faces a structural conflict of interest.  Id.  In such circumstances, "[s]imply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan's administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis."  Id.  Thus, the Court must weigh the conflict on interest along with other factors such as "the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, [and] whether the administrator provided its independent experts with all of the relevant evidence."  Id.

Here, as in Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008), "MetLife labors under such a conflict of interest: It both decides who gets benefits and pays for them, so it has a direct financial incentive to deny claims."  Thus, the Court cannot simply engage in an abuse of discretion analysis.  Instead, it must undertake the more thorough examination required by Montour, 588 F.3d at 630.

In Metropolitan Life Insurance Co. v. Glenn, __ U.S. __, 128 S. Ct. 2343 (2008), the Supreme Court provided guidance on how the conflict of interest should be taken into consideration:

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has

a history of biased claims administration.  It should prove less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id. at 2351.  The Court noted that there was no exact way to apply this standard, but that the "want of certainty in judicial standards partly reflects the intractability of any formula to furnish definiteness of content for all the impalpable factors involved in judicial review." Id. at 2352.

Applying the Supreme Court's decision in Glenn to this case, the Court notes that Plaintiff presents evidence that NMR is a medical review firm routinely used by MetLife.  Plaintiff submits a declaration of NMR's CEO, Robert Porter, wherein he states NMR has provided medical reviews for MetLife since 2002.  In 2002, NMR performed 370 reviews for MetLife for which it was paid $236,490.  In 2005, NMR reviewed 1,197 reviews for MetLife and was paid NMR $1,671,605.  (Collins Decl., Ex. 1.)  Plaintiff also submits verified interrogatories from NMR, which state, in contradiction to Porter's declaration that in 2005, MetLife referred 3,209 claims to NMR for which paid NMR $2,063,890.  Further, in 2006, NMR performed 4,441 claims and paid NMR $2,780,795.  (Collins Decl., Ex. 2.)  Plaintiff argues that this evidence of a course of dealing demonstrates bias on the part of NMR doctors.  Glenn instructs the Court to pay attention to the effect the conflict of interest had in Defendant's decision to deny Plaintiff's claim.  See 128 S. Ct. at

2351.  Here, there is no evidence in the record to suggest that Defendant has taken the steps identified in Glenn, such as walling off administrators and penalizing inaccurate decisionmaking, that would reassure the Court as to the limited nature of the conflict.  See id. Thus, the Court will take Defendant's relationship with NMR into account when performing its review.

Further, in Abatie, the Ninth Circuit noted that the "level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." 458 F.3d at 968.[5] On the other hand, however, a court also may weigh a conflict more heavily if (1) the administrator provides inconsistent reasons for denial, (2) fails to investigate a claim adequately or ask the plaintiff for necessary evidence, (3) fails to credit a claimant's reliable evidence, (4) has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly, (5) or by making decisions against the weight of evidence in the record.  Id.

Here, Plaintiff argues that MetLife(1) failed to ask for necessary evidence, and (2) inconsistently categorized the her job such that MetLife's independent reviewers used the wrong standard in evaluating whether Plaintiff was disabled.

---

[5] The Court notes that the Supreme Court's decision in Glenn is consistent with the Abatie framework.  See Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1029 (9th Cir. 2008) (instructing the district court to apply the "Metlife/Abatie standard" on remand); Toven v. Metropolitan Life Ins. Co., No. CV 06-7260 ABC(RZx), 2008 WL 5101727, at *8 n.6 (C.D. Cal. Dec. 2, 2008) ("Glenn is entirely consistent with the previously governing framework for ERISA cases set forth in Abatie.").

There is evidence that MetLife failed to ask Plaintiff for necessary evidence.  Although Defendant repeatedly asked for objective evidence of Plaintiff's inability to work, MetLife did not specify what evidence would be appropriate.  Plaintiff's claim was approved on the basis of Dr. Flaningam's office notes and diagnosis.  At Plaintiff's request, Dr. Flaningam continued to fax MetLife his progress notes chronicling Plaintiff's disease.  Further, both Dr. Flaningam and Plaintiff asked MetLifewhat type of evidence would be necessary to substantiate Plantiff's claim.  Dr. Flaningam specifically asked for "MetLife's help in letting [him] know more specifically what information would assist in showing disability in Mrs. Lavino's case." (AR 203.)  Plaintiff even wrote, "From your letter it appears that you are asking for something very specific.  If this is the case, please make your request clear and understandable."  (AR 150.)  Despite these requests, Defendants now argue:

> Even if claimed disability is based upon a condition that cannot
> itself be verified by objective evidence, such as fibromyalgia,
> "the *physical limitations* imposed by the symptoms of such
> illnesses *do* lend themselves to objective analysis," nevertheless.

(Def's Brief at 18 (quoting Boardman v.Prudential Ins. Co. of Am., 337 F.3d 9, 16 n.5 (1st Cir. 2003) (emphasis added by Defendant).

The Ninth Circuit has clearly held that it is the responsibility of the claims administrator to have a clear dialogue with plan participants and let them know specifically what information in needed. Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 870 (9th Cir. 2008) (citing Booton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997)).  In Saffon, the court explained

that "the ERISA regulations . . . call[] for a 'meaningful dialogue'
between claims administrator and beneficiary.  In resolving [the
plaintiff's] claim for benefits, MetLife was required to give her '[a]
description of any additional material or information' that was
'necessary' for her to 'perfect the claim,' and to do so 'in a manner
calculated to be understood by the claimant.'"  Id. at 870 (quoting 29
C.F.R. § 2560.503-1(g)).[6]  In that case, MetLife denied a claim based on
the plaintiff's failure to produce objective evidence during the
determination process.  Id. at 870.  However, MetLife had never
actually asked for objective evidence, so the plaintiff had never had
the opportunity to provide such evidence.  Id. at 872-73.

The present case, though not quite as egregious as Saffon, is
similar in that MetLife never told Plaintiff what type of evidence
would satisfy MetLife's request for "objective" evidence.  Plaintiff
repeatedly requested guidance on the type of evidence MetLife sought.
Despite Plaintiff's specific requests, MetLife never "g[a]ve her a
description of any additional material or information' that was
necessary for her to perfect the claim, and [] do so in a manner
calculated to be understood by the claimant."  Saffon, 522 F.3d at 870
(internal quotations and alterations omitted).  MetLife cannot now
argue that it was Plaintiff's responsibility to guess at the
appropriate objective measurement, if there is even one available.  As
such, the Court will weigh the conflict slightly stronger because
MetLife did not clearly indicate what tests and evidence would be
appropriate to support Plaintiff's claim.

---

[6] See 29 U.S.C. § 1133(1) and (2) and 29 C.F.R. 2560.503-1 (g)(1) and
(h)(2).

Plaintiff also argues that MetLife selectively chose to review Plaintiff's claim as though her job was sedentary despite the fact that MetLife representatives first classified her job first as "medium," and then changed it to "light."  In other words, MetLife did not have a consistent classification for Plaintiff's job.  Dr. Payne concluded that Plaintiff had *no* impairment and could work at a light level (AR 202), while and Dr. Lumpkin refers to Plaintiff's occupation as "sedentary." (AR 172.)  MetLife's inconsistent reporting of the level of her work directly affected the review.  For instance, it is not clear whether Dr. Lumpkin would have come to a different conclusion if she knew that Plaintiff's occupation was then categorized as light.  It is presumable that Dr. Payne would still have denied benefits because he concluded that Plaintiff had *no* physical limitations.

**B.   Decision to Deny Benefits**

Turning to MetLife's actual decision to deny Plaintiff's claim, the Court finds that MetLife abused its discretion in denying Plaintiff's claim.  MetLife based its decision to terminate Plaintiff's benefits on the lack of objective evidence supporting Plaintiff's pain.  Because MetLife concluded that Plaintiff had not submitted objective evidence of physical limitations due to pain, MetLife denied Plaintiff's claim.

Caselaw suggests that there is no "objective" method for measuring pain.  In Saffon, the Ninth Circuit quoted its Social Security caselaw for the proposition that "disabling pain cannot always be measured objectively" and "individual reactions to pain are subjective and not easily determined by reference to objective measurements."  522 F.3d at 872-73 & n.3 (citing Bunnell v. Sullivan, 947 F.2d 341, 348 (9th Cir.

1991) (en banc); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989);

Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986) (per curiam)).

This conclusion is supported by a number of lower court authorities.

Lona v. Prudential Ins. Co. of America, No. 07-CV-1276-IEG (CAB), 2009

WL 801868, at *13 (S.D Cal. Mar. 24, 2009); Minton v. Deloitte and

Touche USA LLP Plan, 631 F. Supp. 2d 1213, 1219 (N.D. Cal. 2009); Magee

v. Metropolitan Life Ins., 632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009).

    MetLife's request for "objective" evidence is particularly

problematic in light of the fact that Plaintiff's basic conditions,

fibromyalgia and fatigue, are inherently resistant to object

verification.  In fact, the Ninth Circuit has stated that fibromyalgia

is "entirely subjective." Jordan v. Northrop Grumman Corp. Welfare

Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2004) ("Fibromyalgia's cause

or causes are unknown, there is no cure, and, of greatest importance to

disability law, its symptoms are entirely subjective.  There are no

laboratory tests for the presence or severity of fibromyalgia."); see

also Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) ("The ALJ

erred by effectively requiring 'objective' evidence for a disease that

eludes such measurement.  Every rheumatologist who treated [plaintiff]

diagnosed her with fibromyalgia.") (internal citations and quotations

omitted); Lona, 2009 WL 801868, at *13; Minton, 631 F. Supp. 2d at 1219

("By effectively requiring 'objective' evidence for a disease that

eludes such measurement, MetLife has established a threshold that can

never be met by claimants who suffer from fibromyalgia, no matter how

disabling the pain."); Magee, 632 F. Supp. 2d at 318.

    It is clear from Saffon, 522 F.3d at 872-73 & n.3, that the Ninth

Circuit has applied the Cotton test from the Social Securities

disability cases.  Under the Cotton standard, "[i]f the claimant produces evidence to meet the Cotton test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996).  As explained by the Ninth Circuit:

> Under the Cotton test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . . .'" Bunnell, 947 F.2d at 344 (quoting 42 U.S.C. § 423(d)(5)(A)(1998); Cotton, 799 F.2d at 1407-08.  The Cotton test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

Id. at 1281-82.

Here, MetLife never disputed Plaintiff's diagnosis of fibromyalgia.  Instead, MetLife denied Plaintiff's claim on the basis that her pain did not limit her from engaging in sedentary employment. Dr. Lumpkin did note that Plaintiff was not taking Lyrica, but did not discuss the fact that Plaintiff's treating doctor, Dr. Flaningam, noted that Plaintiff had already tried Lyrica and experienced greater pain. (AR 248.)  MetLife now argues that Plaintiff showed signs of malingering because she refused to take the medication.  However, MetLife does not point to any evidence to show that Plaintiff's adverse

reaction to Lyrica and other medications would discredit her diagnosis or prove that she was not disabled. Defendants also argue that Plaintiff was able to work because she refused to take weaker pain medications such as ibuprofen. (Defs.' Post-Trial Brief at 3.) Defendants ignore the fact that at various points in Plaintiff's medical history, one of Plaintiff's doctors prescribed her treatments other than pain medication, such as 20 mg of Feldene and supplements such as flaxseed oil and borage oil (AR 183), and Plaintiff's other doctor noted that "I'm not sure that any medicine will bring about significant relief." (AR 248.) In fact, MetLife's own reviewing doctors acknowledged that Plaintiff was "receiving appropriate care and treatment," Plaintiff was "compliant with the treatment plan," and that "necessary" medications were "being prescribed [] for symptom palliation and control of symptoms." (AR 207.) Absent additional evidence from Defendants, Plaintiff's mere refusal to take ibuprofen does not adequately justify MetLife's termination of her benefits.

Also, Defendants do not point to any evidence in the denial letters or anything sent to Plaintiff that takes issue with Plaintiff's reluctance to take medication. <u>See</u> <u>Saffon</u>, 522 F.3d at 870 (requiring "meaningful dialogue" between insurer and insured). Plaintiff's refusal to take medication was never grounds for Defendant's denial during the actual appeal. Further, Defendants have not cited any legal authority which would allow MetLife to change its reasons for denial when a plaintiff appeals the decision to Court. <u>Cf.</u> <u>id.</u> at 872 ("coming up with a new reason for rejecting the claims at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective

evaluation."); <u>Jebian v. Hewlett-Packard Co. Employee Benefits</u>
<u>Organization Income Protection Plan</u>, 349 F.3d 1098, 1104 (9th Cir.
2003) (even under deferential abuse of discretion review, insurer may
not rely on "subsequent rationale articulated by counsel").

Further, at no point did any doctors contracting to work for
MetLife engage in an in-person examination of Plaintiff.  Plaintiff
continually reported her symptoms to her own doctors, and these two
doctors who examined her directly both diagnosed her with fibromyalgia.
Though the lack of an in-person examination is not determinative, <u>see</u>
<u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 832 (2003), it is
a relevant consideration, especially with respect to conditions that
are not susceptible to objective verification, such as fibromyalgia.
<u>See</u> <u>Benecke</u>, 379 F.3d at 594.  ("Every rheumatologist who treated
Benecke (Doctors Harris, Pace, and Gluck) diagnosed her with
fibromyalgia.  Benecke consistently reported severe fibromyalgia
symptoms both before and after diagnosis, and much of her medical
record substantially pre-dates her disability application.")

Finally, at trial, Defendants conceded that there is no objective
test to measure Plaintiff's inability to function due to pain.
Accordingly, MetLife was requesting objective evidence measuring
Plaintiff's pain despite the fact – well-established in the caselaw –
that there is no objective measure for such pain.  In essence, then, by
requesting "objective" evidence, MetLife "turn[ed] down [Plaintiff's]
application for benefits based on [Plaintiff's] failure to produce
evidence that simply is not available." <u>Saffon</u>, 522 F.3d at 873.

Weighing the Court's determinations that (1) MetLife has a
structural conflict; (2) that Dr. Lumpkin reviewed Plaintiff's claim as

though she had a sedentary position, instead of light or medium; (3) that MetLife's doctors completed only a paper review, not an in-person review; (4) that MetLife never alerted Plaintiff to what objective evidence was required; (5) MetLife's concession that pain cannot be objectively measured; and, most importantly, (6) that no reason was given other than the lack of objective evidence, the Court finds that MetLife abused its discretion in denying Plaintiff's claim.

**C.   Remedy**

Plaintiff requests awards to date.  Plaintiff was denied on the basis of her own occupation.  However, awarding benefits up to the current date would involve a finding that Plaintiff should also qualify for benefits under the "any occupation" provision.  In Grosz-Salomon v. Paul Revere, the Ninth Circuit held:

> [R]etroactive instatement of benefits is appropriate in ERISA cases where, as here, 'but for the insurer's arbitrary and capricious conduct [the insured] would have continued to receive the benefits or where 'there was no evidence in the record to support a termination of benefits'.  In other words, a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.  This court's decision in Saffle v. Sierra Pacific Bargaining Plan, 85 F. 3d 455, 461 (9th Cir. 1996) does not counsel to the contrary.  Saffle stands for the proposition that 'remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination.'  This proposition is both unremarkable and

inapposite. . . . [The administrator] did not misconstrue the definition of 'disabled' or apply the wrong standard to evaluate Grosz-Salomon's claim.  It applied the right standard, but came to the wrong conclusion.  Under these circumstances, remand is not justified.  Retroactive reinstatements of benefits was proper. 237 F.3d 1154, 1163 (9th Cir. 2001).

As explained further in Pannebecker v. Liberty Life Assurance Co. of Boston, 542 F.3d 1213 (9th Cir. 2008):

[t]he ERISA claimant whose initial application for benefits has been wrongfully denied is entitled to a different remedy than the claimant whose benefits have been terminated.  Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance. But if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions.

Id. at 1221.

Because MetLife improperly terminated Plaintiffs' benefits, reinstatement of the terminated benefits is appropriate.  However, because MetLife has never had an opportunity to decide Plaintiff's case under the "any occupation" standard, Plaintiff's request for "any occupation" benefits is not an appropriate subject of this action. This Court is not the proper forum to submit an "any occupation" claim in the first instance.  Remand is proper with respect to the any-occupation standard.  See Saffle, 85 F. 3d at 461; accord Pakovich v.

Broadspire Services, Inc., 535 F.3d 601, 605, 607 (7th Cir. 2008)
("While Broadspire was not required to evaluate Pakovich's eligibility
under the 'any occupation' standard contemporaneously with its
determination that she was not disabled from working her 'own
occupation,' such a determination became necessary after the district
court found that Broadspire erred in denying Pakovich coverage under
the 'own occupation' standard.  At issue, then, is whether the district
court properly took it upon itself to make this determination, or
whether Broadspire should have had the first attempt at the matter. . .
.  [W]e order that the district court remand the case to the Plan
Administrator to determine whether Pakovich was eligible for disability
benefits beyond July 17, 2004 under the Plan's 'any occupation'
standard."); Scott v. Unum Life Ins. Co. of America, No. C 05-275 JF
(PVT), 2006 WL 3533037, at *6 (N.D. Cal. Dec. 7, 2006) ("Because Unum
based its denial of benefits on its determination that Scott did not
meet the "own occupation" standard, Unum never considered whether Scott
met the "any occupation" standard that was applicable after the first
twenty-four months of long term disability.  Accordingly, the Court
concludes that the appropriate remedy is remand for a determination of
disability under the "any occupation" standard.")

     Lastly, Plaintiff also argues that MetLife should have paid her
coverage at the 70% level rather than the 60% level.  Plaintiff's
benefits started out at the 70% level and then were decreased.
Plaintiff argues that any award should be at the 70% level.  As
Plaintiff did not appeal this to MetLife in the first instance, the
Court remands this determination to MetLife.

Because Defendant's termination decisions was an abuse of discretion, Plaintiff's "own occupation" benefits are reinstated from the time they were terminated to the time that such benefits would have expired.  Plaintiff's other requests must be remanded for a determination by MetLife.

**IV.  Conclusion**

For the reasons stated above, the Court finds that Defendants abused their discretion by terminating Plaintiff's benefits. Accordingly, the Court enters judgment for Plaintiff and ORDERS Plaintiff's benefits REINSTATED from the time they were terminated to the time they were due to expire.  Plaintiff's other claims are REMANDED to MetLife.  Plaintiff is ORDERED to file a proposed final judgment consistent with this Order.

IT IS SO ORDERED.

DATED:___January 13, 2010_____          _____

                                                       STEPHEN V. WILSON

                                             UNITED STATES DISTRICT JUDGE